IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TRISTAN ASSANCE,<br><br>Plaintiffs,<br><br>vs.<br><br>LINCOLN COUNTY, BRANDON HOLZER, JAMES KIRK KRAFT, and DOES 1-10,<br><br>Defendants. | CV 24–9–M–DWM<br><br>OPINION<br>and ORDER |

On January 11, 2024, Tristan Assance sued Lincoln County, Deputy Brandon Holzer, and Deputy James Kraft under 42 U.S.C. § 1983, alleging that the deputies used excessive force when they tasered and shot him in January 2021. (*See* Doc. 1.) Deputy Holzer seeks judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure on the grounds that he is entitled to qualified immunity. (Doc. 24.) That motion is denied.

## BACKGROUND

At this stage, the factual allegations in the complaint "are taken as true and construed in the light most favorable to the plaintiffs." *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001) (internal quotation marks and citations omitted).

1

On January 14, 2021, officers from the Lincoln County Sheriff's Office responded to a report of domestic disturbance between Assance and his spouse, Kristen Koenig. (Doc. 1 at ¶ 13.) "Initial reports indicated that [Assance] was intoxicated, had engaged in self-harm by cutting himself, was suicidal, and was in possession of a kitchen knife and a gun." (*Id.*) The on-scene officers included Captain Boyd White, Detective David Hall, Detective Dan Holskey, and Deputies Kraft and Holzer. (*Id.* ¶ 14.) When law enforcement arrived, they observed Koenig, Assance, and Koenig's friend, Chelsea Baird, "standing on the porch outside the front door to the residence." (*Id.*) At this point, there was no ongoing physical altercation and Assance was not holding a gun. (*Id.*)

White positioned himself behind a large pine tree, approximately 10 yards directly in front of the porch. (*Id.* ¶ 15.) "Kraft approached from ... White's right side and stationed himself behind a vehicle that was parked approximately five (5) yards from the porch." (*Id.* ¶ 16.) "Holzer armed himself with an AR-15 and took position in the trees to ... White's left side approximately twenty (20) yards away from the front porch," close enough to hear the dialogue between White, Kraft, and Assance. (*Id.* ¶ 17.)

White and Kraft approached the porch with their handguns drawn, announcing "Sheriff's Office," directing Koenig and Baird to move aside, and asking Assance to "come talk to [them]." (*Id.* ¶¶ 18, 20.) "Holzer remained

2

hidden in the trees and did not verbally engage [Assance]." (*Id.* ¶ 19.) When Koeing and Baird moved, Assance "reportedly moved to his right side of the porch away from . . . Kraft and retrieved a purple handgun which had been placed on top of a large blue trash can." (*Id.* ¶ 21.) The officers ordered Assance to drop the gun multiple times. (*Id.* ¶ 22.) He replied, "kill me, kill me, kill me. I love my kids. I love my kids." (*Id.*) White and Holzer told Assance that he "didn't have to go to jail," and once again ordered Assance to drop the gun. (*Id.* ¶¶ 22–23.) Assance replied, again, "kill me, kill me, kill me. I love my kids. I love my kids." (*Id.* ¶ 23.) This type of interaction continued for about 60 seconds. (*Id.*)

After approximately 60 seconds, Assance "put the gun in his waistband or dropped it behind him." (*Id.* ¶ 24.) He "then returned to the blue trash can on the porch and began to set up his phone to video and/or livestream." (*Id.* ¶ 25.) "White alleged that [Assance] ha[d] a knife in one hand and his phone in the other." (*Id.* ¶ 26.) Assance alleges, however, that he did not have "have a knife in his hand" at any relevant time. (*Id.* ¶ 46.) At a minimum, Assance was not holding a gun, had his hands on his phone, and his back to White and Holzer. (*Id.* ¶ 28.) At this point, White directed Kraft to use a taser, shouting, "[Kraft], less lethal, [Kraft], less lethal, let's try it." (*Id.*) White's orders were loud enough for both Holzer and Kraft to hear them. (*Id.*) Per the order, Kraft "while holding his firearm in his right hand, unholstered his taser device with his left

3

hand." (*Id.* ¶ 29.) Kraft set the "taser device's red laser site" on Assance for approximately seven seconds. (*Id.*) Kraft deployed the taser at Assance about 36 seconds after the "less lethal" order, (*id.*), without verbal warning, (*id.* ¶ 32). The taser immobilized Assance, causing him to fall to the ground. (*Id.* ¶ 30.) But within a second of the taser firing, Holzer— who was positioned on the opposite side of Assance from Kraft and mistakenly thought the sound of the taser deployment was a gunshot—fired 4 rounds from his AR-15. (*Id.* ¶ 33.) Assance was hit in the right shoulder and leg. (*Id.*) In response to the gunshots, White shouted "That's taser, taser." (*Id.* ¶ 34.)

Assance did not have a gun in his hand when he was tasered or shot. (*Id.* ¶ 43.) "At no time relevant," did Assance "point the gun" at the officers, Koenig, or Baird, (*id.* ¶ 45), "lunge toward or attempt to use a knife against" the officers, Koenig, or Baird, (*id.* ¶ 47), attempt to get closer to the officers, Koenig, or Baird, (*id.* ¶ 48), leave his porch, (*id.* ¶ 49), or "make verbal threats to harm" the officers, Koenig, or Baird, (*id.* ¶ 50).

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v.*

4

*Pickard*, 581 F.3d 922, 924 (9th Cir. 2009). "Although *Iqbal* establishes the standard for deciding a Rule 12(b)(6) motion, . . . Rule 12(c) is functionally identical to Rule 12(b)(6) and . . . the same standard of review applies to the motions brought under either rule." *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (referring to *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)) (internal quotation marks omitted). The operative inquiry is whether the complaint contains "sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Courts "must accept all factual allegations in the complaint as true and construe them in the light most favorable to [the non-moving party]." *Turner v. Cook*, 362 F.3d 1219, 1226 (9th Cir. 2004) (internal quotation marks omitted).

In reviewing 12(b)(6) motions, "courts must consider the complaint in its entirety, as well as other sources . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 322 (2007). "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Consistently, "[t]he court need not accept as true . . . allegations [in the complaint] that contradict facts that may be judicially

5

noticed by the court . . . and may consider documents that are referred to in the complaint whose authenticity no party questions." *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) (internal citations omitted).

Holzer requests the Court take judicial notice of the Statement of Stipulated Facts. (*See generally*, Sched. Order, Doc. 18 at ¶ 4.) At this stage of the proceedings, it is neither necessary nor appropriate to rely on these facts. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("The overuse and improper application of judicial notice . . . can lead to unintended and harmful results . . . [including] premature dismissals of plausible claims."). Therefore, the following analysis is limited to the facts alleged, taken as true, in the complaint.

## ANALYSIS

Deputy Holzer seeks judgment on the pleadings, insisting he is entitled to qualified immunity for using deadly force on Assance. "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2017)). Courts assessing whether an individual officer is shielded by qualified immunity engage in a two-step inquiry, asking: "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established

6

at the time of the officer's alleged misconduct." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018) (internal quotation marks and citations omitted). This test is flexible and does not need to be analyzed in succession. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). Nonetheless, the analysis below first considers whether Assance has plausibly alleged the violation of a constitutional right and second whether that right was clearly established. At this stage of the proceedings, neither inquiry favors Holzer.

I.  **Fourth Amendment Violation**

The Fourth Amendment grants the "right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (internal quotation marks omitted). The relevant inquiry is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (internal quotation marks omitted). "To determine whether the use of force was objectively reasonable, the court balances the 'nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.'" *Vos*, 892 F.3d

7

at 1030 (quoting *Graham*, 490 U.S. at 396). Because this inquiry is highly fact intensive, the motion for judgment on the pleadings is denied.

### A.   Nature of the Intrusion

"'The intrusiveness of a seizure by means of deadly force is unmatched.'" *Id.* at 1031 (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Id.* (internal quotation marks and citations omitted). Because no one disputes that Deputy Holzer used the highest level of force against Assance when he shot him multiple times with his AR-15, (*see* Doc. 1 at ¶ 33), the question is whether "the governmental interests at stake were sufficient to justify it," *Vos*, 892 F.3d at 1031.

### B.   Governmental Interests

"The strength of the government's interest is measured by examining three primary factors: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). These factors are not "exclusive," however, and "[o]ther relevant factors include the availability of less intrusive

8

force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed." *Id.* at 1033–34. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

First, Holzer was responding to a potential domestic disturbance involving an individual with erratic behavior. (Doc. 1 at ¶ 13.) The "[i]nitial reports indicated that [Assance] was intoxicated, engaged in self-harm by cutting himself, was suicidal, and was in possession of a kitchen knife and a gun." (*Id.*) However, "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

Second, and the most important *Graham* factor, is whether the suspect posed an immediate threat to the safety of officers or others. *Vos*, 892 F.3d at 1031–32.

9

Assance was acting unpredictably and had weapons on his person at various times, including a kitchen knife and gun. (Doc. 1 at ¶¶ 13, 21, 24, 26, 28.) However, Assance did not interfere with officers when they asked Koenig and Baird to step aside, (*id.* ¶ 21), and "did not make verbal threats to harm" anyone, (*id.* ¶ 50). At the time he was tasered and shot, Assance was not holding a gun and had his back towards White and Holzer. (*Id.* ¶ 28.) After mistaking the taser deployment for a gunshot, Holzer shot Assance despite the fact that the taser brought him to the ground and Holzer did not observe Assance with a gun prior to shooting him. (*Id.* ¶¶ 30, 33, 42.) While Assance did threaten self-harm when he instructed the officers to kill him, (*id.* ¶¶ 22–23), "[a]t no time relevant," did Assance "point the gun" at the officers, Koenig, or Baird, (*id.* ¶ 45); "lunge toward or attempt to use a knife against" the officers, Koenig, or Baird, (*id.* ¶ 47); attempt to get closer to the officers Koenig, or Baird, (*id.* ¶ 48); or "make verbal threats to harm" the officers, Koenig, or Baird, (*id.* ¶ 50).

Third, while Assance was not attempting to flee or actively resist arrest, he was repeatedly non-compliant with officer orders. (*Id.* ¶ 22.) And when Assance was ordered to drop the gun, he told the officers to kill him. (*Id.*) Nevertheless, throughout the interaction, Assance stayed within the confines of his porch. (*Id.* ¶ 49.)

10

The additional relevant considerations identified in *Graham* are also implicated here. Most importantly, other less intrusive methods of force were available. White instructed the officers to use "less lethal" force, meaning a taser. (*Id.* ¶ 28.) Indeed, Kraft had a taser and was in close enough proximity to use it. (*Id.* ¶ 29.) And based on the initial reports, officers should have known that Assance was mentally unstable because he was reported to be suicidal and intoxicated. (*Id.* ¶ 13.) Additionally, when the officers arrived on scene they witnessed his erratic, irrational behavior such as when he responded, "kill me, kill me, kill me . . . I love my kids. I love my kids. I love my kids" when they told him he "didn't have to go to jail." (*Id.* ¶¶ 22–23.)

Taken on the whole, Assance has plausibly alleged that it was objectively unreasonable for Holzer to use deadly force.

## II. Clearly Established Law

Because Assance has plausibly alleged a violation of his constitutionally protected right to be free from excessive force, the next inquiry is whether the violative nature of Holzer's actions were clearly established. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (internal quotation marks and citations omitted). "Because the focus is on whether the officer had fair notice that [the officer's] conduct was unlawful,

11

reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah, Okl. v. Bond*, 595 U.S. 9, 12 (2021) (internal quotation marks omitted). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The plaintiff "bears the burden of showing that the rights allegedly violated were clearly established." *Vos*, 892 F.3d at 1035 (internal quotation marks and citations omitted). While the law does "not require a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 741). The Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela*, 548 U.S. at 104 (internal quotation marks and citations omitted).

The dispositive question here is therefore whether existing precedent placed the conclusion that Holzer acted unreasonable in these circumstances beyond debate. To be sure, an officer's decision not to use lethal force despite the availability of less-than-lethal alternatives is not, by itself, dispositive. *See Mullenix*, 577 U.S. at 9, 19 (concluding the officer was entitled to qualified

immunity even when the suspect was fleeing in a vehicle and the officer shot at the vehicle even when he was not trained in this method and strip spikes were available). Rather, whether the right at issue was clearly established in this circumstance turns heavily on the facts of the encounter as a whole. A brief survey of qualified immunity decisions in the Ninth Circuit demonstrates this nuance.

In *Bryan v. MacPherson*, for example, the court determined that Officer MacPherson was entitled to qualified immunity for tasering Bryan even though Bryan was not seen with any weapons and did not threaten MacPherson, but facts were disputed regarding whether Bryan disobeyed orders to stay in the car and made movements towards MacPherson. 630 F.3d 805, 822, 830 (9th Cir. 2010) (deciding "that a reasonable officer in Officer MacPherson's position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005" because the case law at this time was limited).

On the other hand, in *Deorle v. Rutherford*, the suspect, Deorle, was erratic, shouting "kill me," stating he would "kick [the] ass" of an officer, "brandishing a hatchet at a police officer," and "carrying an unloaded plastic crossbow in one hand" and what appeared to be a bottle of lighter fluid. 272 F.3d at 1276–77. Deorle did not comply with requests to disarm but instead walked towards Officer Rutherford who then responded by shooting Deorle in the face with a beanbag

13

without warning. *Id.* at 1278. In these circumstances, the court held that "[e]very police officer should know that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285; *see also Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("Under Taylor's version of the shooting, the police officers could not have reasonably believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time.").

But the Supreme Court has been careful to curtail the idea that erratic, mentally-ill behavior foists special obligations on law enforcement. In *Kisela*, for example, the court held that the law was not clearly established when officers shot a mentally ill woman holding a kitchen knife by her side standing in close proximity to her roommate. 584 U.S. at 105, 108. *Kisela* distinguished *Deorle*, noting the suspect "was armed with a large knife; was within striking distance of [a bystander]; ignored the officers' orders to drop the weapon; and the situation unfolded in less than a minute." *Id.* at 107.

14

The Ninth Circuit has also distinguished *Deorle* from instances when there is a "threatening or aggressive suspect." *See Vos*, 892 F.3d at 1035 (noting that *Deorle* and *Bryan* did not apply in *Vos* because Vos acted aggressively, "ultimately charging at officers with something in his upraised hand" after pretending to have a firearm and cutting a bystander with scissors); *S.B. v. Cnty. of San Deigo*, 864 F.3d 1010, 1017 n.5 (9th Cir. 2017) (declining application of *Deorle* because the suspect was threatening or aggressive).

This case is not on fours with *Bryan*, *Deorle*, *Curnow*, *Kisela*, or *Vos*. The facts as alleged most closely track *Deorle*. While Assance did not act threatening towards officers or others, like Deorle, Assance was erratic, voiced a suicidal ideation, had a weapon on his person, and was shot without warning. (Doc. 1 at ¶¶ 13, 22–23, 26, 31.) Unlike Deorle, however, Assance never moved towards officers or others, (*id.* ¶ 47), but he was instructed multiple times to drop his gun before, (*id.* ¶ 23), and after approximately 60 seconds, he "put the gun in his waistband or dropped it behind him," (*id.* ¶ 24). Additionally, unlike Deorle, Assance was did not make verbal threats towards officers. (*Id.* ¶ 50). Like the suspect in *Curnow*, Assance had his back to White and Holzer when he was shot and never pointed his gun at the officers or others. (*Id.* ¶¶ 28, 45).

Even taking Assance's pleading on its face, however, the facts of the incident are not completely clear. It is unclear whether Assance was still holding

15

the knife. (*Compare* Doc. 1 at ¶ 26 (stating "White alleged that [Assance] has a knife in one hand and his phone in the other") *with id.* at ¶ 46 (stating at no relevant time did Assance "have a knife in his hand").) It is also unclear whether Assance had a gun on his person when he was shot. (*See id.* ¶¶ 24, 42).

Based on the facts in the complaint, Assance has plausibly alleged the violation of a clearly established right.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Holzer's motion for judgment on pleadings (Doc. 24) is denied.

DATED this 7th day of November, 2024.

_____
Donald W. Molloy, District Judge
United States District Court